WILLIAM J. FRIMEL (Bar No. 160287)
Seubert French Frimel & Warner LLP
1075 Curtis Street
Menlo Park, CA  94025
Tel:  650.322.3048
Fax:  650.833.2976

Attorneys for Plaintiffs and Counterclaim-Defendants
BEAUTIFUL SLIDES, INC. and MITCH GRASSO

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEAUTIFUL SLIDES, INC. and MITCH GRASSO,<br><br>            Plaintiffs,<br><br>      v.<br><br>MAY ALLEN,<br><br>            Defendant. | Case No. 3:17-cv-01091-MMC<br><br>**REPLY BY PLAINTIFFS AND COUNTERCLAIM-DEFENDANTS BEAUTIFUL SLIDES, INC. AND MITCH GRASSO IN SUPPORT OF THEIR MOTION TO DISMISS THE FIRST THROUGH FOURTH CAUSES OF ACTION IN COUNTERCLAIMANT MAY ALLEN'S AMENDED COUNTERCLAIM**<br><br>Hearing Date:  November 17, 2017<br>Hearing Time:  9:00 a.m.<br>Courtroom:  7<br>Judge:  Hon. Maxine M. Chesney |
| MAY ALLEN,<br><br>            Counterclaimant,<br><br>      v.<br><br>BEAUTIFUL SLIDES, INC., MITCH GRASSO, and DOES 1-100,<br><br>            Counterclaim-Defendants. | |

**TABLE OF CONTENTS**     **Page(s)**

INTRODUCTION 1

ARGUMENT 1

I. ALLEN'S FIRST THREE CLAIMS ARE PREEMPTED, AS THE ACC FAILS TO ALLEGE FACTS ESTABLISHING A PARTNERSHIP OR JOINT VENTURE 1

   A. It Is Appropriate to Dismiss Allen's Claims Based on the ACC's Failure to Adequately Allege a Partnership or Joint Venture 1

   B. The ACC Does Not Say the Parties Orally Agreed to a Partnership 2

   C. The ACC Fails to Sufficiently Plead that the Parties Intended to Share Profits from, or Management and Control of, the Supposed Enterprise 3

      1. Intent to share profits 3

      2. Intent to share management and control 5

      3. "Additional surrounding circumstances" 9

II. THE COPYRIGHT ACT PREEMPTS ALLEN'S CONVERSION CLAIM 10

III. ALLEN'S BREACH OF IMPLIED CONTRACT CAUSE OF ACTION IS PREEMPTED AND INADEQUATELY PLEADED 11

IV. ALLEN'S FRAUD CAUSE OF ACTION FAILS TO PLEAD WITH PARTICULARITY 13

   A. Concealment or Suppression, and Intent to Defraud 13

   B. Duty to Disclose 14

   C. Detrimental Reliance 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

| Case | Page(s) |
|---|---|
| *April Enters., Inc. v. KTTV & Metromedia, Inc.*, 147 Cal. App. 3d 805 (1983) | 5 |
| *Auditorium Co. v. Barsotti*, 40 Cal. App. 592 (1919) | 5 |
| *Broam v. Bogan*, 320 F.3d 1023 (9th Cir. 2003) | 14 |
| *Brown v. Snapchat, Inc.*, No, CV 13-08569, 2014 WL 12573368 (C.D. Cal. Feb. 3, 2014) | 10 |
| *Celebrity Chefs Tour, LLC v. Macy's, Inc.*, No. 13-cv-2714, 2015 WL 11237460 (S.D. Cal. Aug. 10, 2015) | 2, 7-8 |
| *Doll v. Stars Holding Co.*, No. C-05-1132, 2005 WL 2811767 (N.D. Cal. Oct. 27, 2005) | 14-15 |
| *Fremont Indem. Co. v. Fremont Gen. Corp.*, 148 Cal. App. 4th 97 (2007) | 11 |
| *Holmes v. Lerner*, 74 Cal. App. 4th 442 (1999) | 4, 5 |
| *Kapu Gems v. Diamond Imports, Inc.*, No. 15-cv-03531, 2016 WL 4259119 (N.D. Cal. Aug. 12, 2016) | 5 |
| *Landucci v. State Farm Ins. Co.*, 65 F. Supp. 3d 694 (N.D. Cal. 2014) | 12 |
| *Leitner v. Sadhana Temple*, No. 13-07902, 2014 WL 12588643 (C.D. Cal. Oct. 17, 2014) | 7, 8 |
| *In re Lona*, 393 B.R. 1 (Bankr. N.D. Cal. 2008) | 9-10 |
| *Love v. The Mail on Sunday*, No. CV-05779, 2006 WL 4046181 (C.D. Cal. Nov. 16, 2006) | 9 |
| *Love v. The Mail on Sunday*, 489 F. Supp. 2d 1100 (C.D. Cal. 2007) | 7, 9 |
| *Mohebbi v. Khazen*, 50 F. Supp. 3d 1234 (N.D. Cal. 2014) | 14-15 |
| *Moreno v. SFX Ent'mt., Inc.*, No. CV-14-0880, 2015 WL 4573226 (C.D. Cal. Jul. 29, 2015) | 13 |
| *MP Nexlevel of Cal., Inc. v. CVIN, LLC*, No. 1:14–cv–288, 2014 WL 5019639 (E.D. Cal. Oct. 7, 2014) | 2, 4, 7, 8 |
| *Neubronner v. Milken*, 6 F.3d 666 (9th Cir. 1993) | 14 |

| | |
|---|---|
| *Orosco v. Sun-Diamond Corp.*, 51 Cal. App. 4th 1659 (1997) | 7 |
| *Ovitz v. Chartis Prop. Cas. Co.*, No. CV 15-3916, 2015 WL 12746209 (C.D. Cal. Sept. 14, 2015) | 14 |
| *Prostar Wireless Group, LLC v. Domino's Pizza, Inc.,* No. 3:16-cv-05339, 2017 WL 67075 (N.D. Cal. Jan. 6, 2017) | 2 |
| *ROTFL Prods., LLC v. Gzebb*, No. 13-cv-0293, 2013 WL 12181763 (N.D. Cal. Aug. 5, 2013) | 8 |
| *Sacramento E.D.M., Inc. v. Hynes Aviation Indus., Inc.*, 965 F. Supp. 2d 1141 (E.D. Cal. 2013) | 2, 6-7 |
| *Second Measure, Inc. v. Kim*, 143 F. Supp. 3d 961 (N.D. Cal. 2015)) | *passim* |
| *Simmons v. Ware*, 213 Cal. App. 4th 1035 (2013) | 5 |
| *Toussie v. Town Bd.*, No. Civ. 08-1922, 2010 WL 597469 (E.D.N.Y. Feb. 17, 2010) | 7 |
| *Universal Sales Corp. v. Cal. Press Mfg. Co.*, 20 Cal. 2d 751 (1942) | 5 |
| *U.S. v. Fresno Cty.,* No. CV-F-01-5990, 2006 WL 190852 (E.D. Cal. 2006) | 7 |
| *Ward v. Mitchell,* No. 12–cv–3932, 2013 WL 1758840 (N.D. Cal. Apr. 24, 2013) | 11 |
| *Wiltsee v. Cal. Emp. Comm.*, 69 Cal. App. 2d 120 (1945) | 4 |
| *Wolf v. Super. Ct.*, 107 Cal. App. 4th 25 (2003) | 4 |
| *Worth v. Universal Pictures, Inc.*, 5 F. Supp. 2d 816 (C.D. Cal. 1997) | 11 |

REPLY IN SUPPORT OF MOTION TO DISMISS

# INTRODUCTION

Tellingly, Allen's opposition makes no attempt to explain the contradictions between her Amended Counterclaim ("ACC") and her initial Counterclaim — most notably, the discrepancies between (1) the Counterclaim's averment that Grasso did not form the intent to "cut Allen out" of their purported enterprise until September 2016, and the ACC's vague allegation "on information and belief" that, "if Grasso did not always intend to keep the value of Beautiful Slides for himself, Grasso changed his mind and decided to keep the value for himself"; and (2) the Counterclaim's allegation that "[t]here were few formal discussions between Grasso and Allen about the nature of their relationship" beyond Grasso's alleged statement that he would not "screw [Allen] over," and the ACC's conclusory claim that Grasso and Allen "expressly divided management and control of partnership business." Moreover, in insisting that the ACC complies with the Court's directives in dismissing the non-copyright claims, Allen repeatedly relies on language that simply does not appear in the ACC — inaccurately asserting, for instance, that the ACC alleges that, absent Grasso's purported concealment of his intent to "cut Allen out," Allen "would have demanded a partnership agreement in writing," or "backed out of the partnership and worked on developing her own software." For these and other reasons, Allen's opposition only confirms that her tort claims are meritless and should be dismissed without leave to amend.

## I. ALLEN'S FIRST THREE CLAIMS ARE PREEMPTED, AS THE ACC FAILS TO ALLEGE FACTS ESTABLISHING A PARTNERSHIP OR JOINT VENTURE

### A. It Is Appropriate to Dismiss Allen's Claims Based on the ACC's Failure to Adequately Allege a Partnership or Joint Venture

Allen asserts that, "[b]ecause the question whether a joint venture or partnership was formed is a 'fact-specific inquiry,' . . . it is not appropriate for the Court to address that question . . . under Rule 12(b)(6)." (Opp'n. to Mot. to Dismiss, Oct. 16, 2017 ("Opp'n."), at 2 (quoting *Second Measure, Inc. v. Kim*, 143 F. Supp. 3d 961, 968 (N.D. Cal. 2015)). But the quoted text is from *Second Measure*'s summary of the plaintiff's argument, not the court's reasoning. *See Second Measure, Inc.*, 143 F. Supp. 3d at 968 ("*[A]ccording to Kim*, it is not appropriate for the Court to address whether a joint venture or partnership was formed on a motion under Rule 12(b)(6) . . . .") (emphasis added). *Second Measure* acknowledged it *is* proper to dismiss a claim

1
REPLY IN SUPPORT OF MOTION TO DISMISS

based on a partnership where the plaintiff fails to allege facts supporting the partnership's existence, stating that, "[f]or breach of a partnership or joint venture, the plaintiff must . . . allege an agreement to participate in the management of the business." *Id.* at 971.  Likewise, *Sacramento E.D.M., Inc. v. Hynes Aviation Indus., Inc.*, 965 F. Supp. 2d 1141 (E.D. Cal. 2013), ruled that the complaint's "facts [we]re sufficient to plead the existence of a partnership," *Sacramento E.D.M., Inc.*, 965 F. Supp. 2d at 1150 — not that a claim dependent on a partnership is immune to dismissal.  Moreover, numerous authorities confirm it is appropriate to dismiss Allen's claims for failure to properly allege a partnership or joint venture.  *See Prostar Wireless Group, LLC v. Domino's Pizza, Inc.,* No. 3:16-cv-05339, 2017 WL 67075, *4 (N.D. Cal. Jan. 6, 2017) (dismissing fiduciary breach claim, as plaintiff "has failed to adequately plead sharing of profits and losses" needed to form joint venture); *Celebrity Chefs Tour, LLC v. Macy's, Inc.,* No. 13-cv-2714, 2015 WL 11237460, *8 (S.D. Cal. Aug. 10, 2015) (dismissing claim because "Plaintiffs still fail to allege each of the elements of a joint venture"); *MP Nexlevel of Cal., Inc. v. CVIN, LLC*, No. 1:14–cv–288, 2014 WL 5019639, *9 (E.D. Cal. Oct. 7, 2014) ("[T]he SAC does not allege sufficient facts to establish the existence of a partnership by estoppel . . . .").

**B.     The ACC Does Not Say the Parties Orally Agreed to a Partnership**

Allen next asserts that the ACC "plead[s] the parties orally agreed to form a partnership." (Opp'n. at 3-4 (citing ACC ¶¶ 11, 50, 52, 53).)  But the only actual communications discussed in the cited paragraphs are Allen's alleged April 2014 statement that "I think we should do some serious brainstorming together for a new company," and Grasso's response "Ok."  (ACC ¶ 11.) This exchange was not an agreement to "share profits [or] . . . jointly manage and control the enterprise," which, as the Court stated, are the "requisite elements" of a partnership.  (Ord. Granting Mot. to Dismiss Counterclaims, Aug. 31, 2017 ("8/31 Order"), at 6.)  Grasso did not agree to any such terms in the alleged discussion — only that he would "brainstorm" with Allen, and, even if he agreed to collaborate with Allen in some form, a mere collaboration is insufficient to create a partnership. (Mem. of Ps. & As. in Supp. of Mot. to Dismiss, Oct. 2, 2017 ("Mem."), at 9.)

**C.    The ACC Fails to Sufficiently Plead that the Parties Intended to Share Profits from, or Management and Control of, the Supposed Enterprise**

**1.    Intent to share profits**

*First*, Allen relies on the ACC's allegations that, "[o]n June 9, 2014," "Allen suggested the parties enter into a written agreement memorializing their partnership," and "Grasso responded that a writing was unnecessary because Allen and Grasso were friends" and "he had no intent to 'screw over' Allen." (Opp'n. at 6 (citing ACC ¶ 20).) Allen made substantially similar allegations in her Counterclaim (Def.'s Counterclaim, Apr. 10, 2017 ("Counterclaim"), ¶ 15), and the Court found them insufficient to indicate an intent to share profits (8/31 Order, at 7). Further, Grasso's mere omission to object to Allen's use of the word "partnership" does not give rise to a legal partnership. (Mem. at 10-11.)

*Second*, Allen points to the ACC's averments that "Grasso expressed concern . . . about Allen's ability to contribute sufficient time" in July and August of 2016, and "Grasso had no basis to be anxious about her time commitment but for ultimate profit sharing." (Opp'n. at 6 (citing ACC ¶¶ 31-33).) Allen nowhere explains why Grasso's desire that Allen devote more time to the Software obviously reflects an intent to share profits. Further, as Plaintiffs noted (Mem. at 10-11), Allen's speculation about the reasons for Grasso's "concern" is at odds with Allen's admissions. Allen's Answer admits Grasso advised her, in 2014 and the summer of 2016, that he could not yet offer Allen a salary because he had not obtained outside financing. (Def.'s Answer, Apr. 10, 2017 ("Ans."), ¶¶ 12, 15; Compl., Mar. 2, 2017, ¶¶ 12, 15.) When Grasso obtained financing in September 2016, he offered her salaried employment. (ACC ¶¶ 38, 39.) If anything, Grasso's conduct suggests that, throughout Allen's work, Grasso was considering hiring her once he had sufficient capital, and was "anxious" because he was concerned she might not devote adequate time to the Company. Allen's opposition does not address this issue.

*Third*, Allen relies on the ACC's allegation that, in discussing her prospective employment, "Grasso admitted contributions were made" by Allen "worthy of sharing equity in the company." (Opp'n. at 6 (citing ACC ¶¶ 41, 43).) Grasso's supposed admission that Allen "contributed" to the design or marketing of the Software does not establish a partnership — as

1  noted above, the mere fact that the parties worked together is irrelevant. *See, e.g., MP Nexlevel of
2  Cal., Inc.*, 2014 WL 5019639, *8 (dismissing fiduciary breach claim, as "the Court cannot find . .
3  . any authority holding that a collaboration between two parties to jointly build a project, in and of
4  itself, evinces a legal partnership"). Nor does Grasso's mere inclusion of equity in his
5  employment offer to Allen suggest an intent to equally share profits. *See Wolf v. Super. Ct.*, 107
6  Cal. App. 4th 25, 30-31 (2003) ("[T]he contractual right to contingent compensation in the
7  control of another has never, by itself, been sufficient to create a fiduciary relationship where one
8  would not otherwise exist."); *Wiltsee v. Cal. Emp. Comm.*, 69 Cal. App. 2d 120, 125 (1945)
9  (employment contract affording plaintiff 25% of business's profits "created an employer-
10 employee relationship between the parties, and did not create a partnership," as "the interest in the
11 profits unconnected with any power of control[] does not make [plaintiff] a joint adventurer").
12 Indeed, the ACC says Grasso *declined* to offer Allen a "cofounder" share of the Company's
13 equity, because "i've [sic] done > 99% of the work and taken 100% of the risk," although he
14 offered a smaller "equity grant above perhaps [Allen's] pure experience level." (ACC ¶ 41.)
15        *Fourth*, Allen asserts that, contrary to the Court's prior order, "the agreement to share
16 profits is evidence of, but not a necessary element of a partnership." (Opp'n. at 6.) Allen relies
17 on *Second Measure*'s statement that, although the plaintiff's complaint did not "allege the usual
18 indicia of the existence of a partnership: co-ownership of property, sharing of gross returns, and
19 sharing of business profits," "[t]he presence or absence of any of these indicia is not dispositive."
20 (Opp'n. at 6-7 (quoting *Second Measure, Inc.*, 143 F. Supp. 3d at 972).) Taken in context, the
21 quoted language refers to the fact that the plaintiff did not allege that the parties *actually* shared
22 profits — not that they lacked the *intent* to do so in the future. The plaintiff alleged that, unlike
23 Allen and Grasso, the parties "entered into an 'explicit oral agreement' that 'each of them would
24 have 1/2 ownership and profit interests.'" *Second Measure, Inc.*, 143 F. Supp. 3d at 972.
25        Allen next quotes the statement in *Holmes v. Lerner*, 74 Cal. App. 4th 442 (1999), that
26 "the Legislature intends profit sharing to be evidence of a partnership, rather than a required
27 element of the definition of a partnership." (Opp'n. at 7 (quoting *Holmes*, 74 Cal. App. 4th at
28 453-54).) As the Court observed, *Holmes* so stated in holding that "evidence of 'actual sharing of

profits' is not required" (8/31 Order, at 7 (quoting *Holmes*, 74 Cal. App. 4th at 457)) — not that *intent* to share profits is not essential to a partnership. The parties in *Holmes*, the Court further noted, had "an understanding to share in profits and losses" — in contrast to Grasso and Allen, who are not alleged to have reached such an understanding. (*Id.* (quoting *Holmes*, 74 Cal. App. 4th at 457).) Allen further relies on *Auditorium Co. v. Barsotti*, 40 Cal. App. 592 (1919), but that case held that "the mere agreement between two or more persons to divide the profits of an undertaking is not sufficient to constitute them partners," and thus the trial court properly ruled that *no* partnership existed. *Id.* at 595-96. Finally, Allen cites the statement in *Universal Sales Corp. v. Cal. Press Mfg. Co.*, 20 Cal. 2d 751 (1942), a breach of contract case, that, "[w]hile in a technical joint venture there is usually a sharing of profits and losses, . . . the mode of participating in the fruits of the undertaking may be left to the agreement of the parties." (Opp'n. at 7 (quoting *Univ. Sales Corp.*, 20 Cal. 2d at 764).) But the preceding sentence notes that the parties agreed in writing to share profits, saying the plaintiff would receive a "share of the gross proceeds of sales of" the products at issue, "whether such sales be negotiated by the plaintiff or the defendant . . . ." *Univ. Sales Corp.*, 20 Cal. 2d at 764. Thus, in the quoted text, the court was simply observing that there are many ways in which a contract can accomplish the sharing of profits — not that profit-sharing is not a prerequisite for a joint venture. *Id.* Further, extensive authority confirms that intent to share profits is essential to a partnership or joint venture. *See Kapu Gems v. Diamond Imports, Inc.*, No. 15-cv-03531, 2016 WL 4259119, *8 (N.D. Cal. Aug. 12, 2016) ("The elements necessary for the creation of a joint venture" include "an understanding to share profits and losses") (quoting *April Enters., Inc. v. KTTV & Metromedia, Inc.*, 147 Cal. App. 3d 805, 819 (1983)); *Simmons v. Ware*, 213 Cal. App. 4th 1035, 1054 (2013) ("Agreement to share in the profits and losses of the enterprise is . . . essential to a joint venture.").

      **2.**      **Intent to share management and control**

           **a.**      **The ACC does not adequately plead a joint intent to manage and control the purported enterprise**

Allen characterizes the ACC as asserting that "Allen and Grasso expressly agreed on a division of business management and control based on their respective talents," and claims this

suffices to allege joint management and control.  (Opp'n. at 4 (citing ACC ¶ 14).)  At the outset, Plaintiffs noted that Allen's Counterclaim alleged "[t]here were few formal discussions between Grasso and Allen about the nature of their relationship" and did not mention an "express division of management and control," and the ACC's newly-minted claim that Grasso and Allen formally discussed such a division impermissibly contradicts those allegations.  (Mem. at 14.)  Allen ignores this inconsistency.  Further, as Plaintiffs observed (*id.* at 12), the parties' purported agreement that Grasso would work on "the coding of the software" and Allen would work on "the software's design and product/company positioning" does not amount to joint management and control — for that to exist, Allen would have needed "an equal vote in [some] final management decision" (8/31 Order, at 7), not simply a share of the enterprise's day-to-day tasks.  Allen responds that "this argument is contrary to the express holding of *Second Measure*, where allegations that the parties 'agreed on a division of business responsibilities' and 'an equal say in the control of the management of the joint venture/ partnership'" were "sufficient to defeat a 12(b)(6) motion."  (Opp'n. at 5 (quoting *Second Measure, Inc.*, 143 F. Supp. 3d at 972).)  However, the *Second Measure* complaint did not solely say the parties divided tasks between them — unlike the ACC, it said they had "an equal say in the control of the management of the joint venture/partnership."  *Second Measure,* 143 F. Supp. 3d at 972.  As Plaintiffs' authorities indicate, management of the business is distinct from the mere performance of the business's routine tasks, such as coding and marketing the Software.  (Mem. at 12-13.)  In any event, Allen does not respond to Plaintiffs' observation (*id.*) that, despite Allen's conclusory allegation of an "express division" of tasks, the ACC's description of the parties' work indicates that Grasso, not Allen, had final authority regarding "design and product/company positioning."

*Sacramento E.D.M.*, which Allen also cites, is likewise inapposite.  There, the defendants argued the complaint failed to plead a partnership because it "d[id] not refer to any enforceable contract that would have created a fiduciary relationship between the parties," *Sacramento E.D.M.*, 965 F. Supp. 2d at 1149 — not, as Plaintiffs contend, that the conduct alleged by the plaintiff did not give rise to a partnership.  In rejecting this argument, the court thus addressed an issue distinct from the one raised by Plaintiffs.  Moreover, in contrast to the ACC, the complaint

in *Sacramento E.D.M.* alleged that "the parties agreed to conduct" the alleged partnership's "business together and to share [its] . . . profits, that Defendants agreed to provide operating capital for [its] . . . operations, and that Defendants assumed some of the control over the business enterprise" — not simply that the parties performed different types of work. *Id.*

### b. Allen's attempts to distinguish Plaintiffs' authorities are unpersuasive

*First*, Allen claims a series of cases Plaintiffs cited with respect to management and control (Mem. at 13, 15) are irrelevant because they concerned summary judgment (Opp'n. at 5). While those cases decided summary judgment motions, they are still instructive regarding which facts are relevant to the management and control issue. *See, e.g., U.S. v. Fresno County*, No. CV-F-01-5990, 2006 WL 190852, *3 (E.D. Cal. 2006) ("Although *Hopper*," case relied on by court, "involved summary judgment, not a motion to dismiss," plaintiff failed "to state a claim with regard to the elements set forth in *Hopper*"); *see also Toussie v. Town Bd.*, No. Civ. 08-1922, 2010 WL 597469, *9 n.4 (E.D.N.Y. Feb. 17, 2010) (although cases relied on by court "were decided on motions for summary judgment whereas the instant motion is one to dismiss pursuant to 12(b)(6)," "[b]oth decisions . . . provide guidance on the legal principles that guide a[] . . . claim such as the one under discussion"). Relatedly, numerous authorities dismissing claims predicated on a partnership rely on summary judgment opinions regarding the requirements for such a relationship. *See, e.g., Leitner v. Sadhana Temple*, No. 13-07902, 2014 WL 12588643, *6-7 (C.D. Cal. Oct. 17, 2014) (citing *Orosco v. Sun-Diamond Corp.*, 51 Cal. App. 4th 1659, 1666 (1997) (granting summary judgment based on absence of joint venture)); *MP Nexlevel of Cal.*, 2014 WL 5019639, *8 (citing *Love v. The Mail on Sunday*, 489 F. Supp. 2d 1100, 1108 (C.D. Cal. 2007) (granting summary judgment based on absence of partnership)); 8/31 Order, at 7.

*Second*, Allen claims *Celebrity Chefs Tour* is distinguishable because, beyond finding the complaint's allegation that the purported partners "were jointly in control of their partnership" "conclusory," the court noted the plaintiffs' complaint was internally contradictory, as it claimed both that the alleged partners "had an ownership interest in 'Macy's Great American Chef's Tour'" and that "Plaintiffs . . . alone owned all of the rights to GACT." (Opp'n. at 5-6 (quoting

7
REPLY IN SUPPORT OF MOTION TO DISMISS

*Celebrity Chefs Tour, LLC*, 2015 WL 11237460, *8).)  But that does not distinguish *Celebrity Chefs Tour*, because, as noted above, the ACC also contradicts itself by making numerous allegations suggesting Grasso, not Allen, controlled "the software's design and product/company positioning."  *See also Leitner*, 2014 WL 12588643, *6-7 (as plaintiff's "allegations establish that she had no control over the [alleged joint venture's] . . . internal financial affairs, . . . . [i]n the face of such allegations, the conclusory assertion that [plaintiff] 'delegated [the] control she had in the [ ] joint venture to [defendants]' . . . does not suffice to plead that she had joint control over the alleged business affairs").  In any event, other authorities have held conclusory allegations in support of a partnership insufficient, even absent internal contradictions in the complaint.  *See, e.g., ROTFL Prods., LLC v. Gzebb*, No. 13-cv-0293, 2013 WL 12181763, *4 (N.D. Cal. Aug. 5, 2013) ("Since no partnership relationship is pleaded between [plaintiff] and defendants, [plaintiff] has not asserted plausible grounds on which defendants could have owed a fiduciary duty to it.").

*Third*, Allen asserts that *MP Nexlevel*, which observed, *inter alia*, that "the Court cannot find[] any authority holding that a collaboration between two parties to jointly build a project . . . evinces a legal partnership," *MP Nexlevel of Cal., Inc.*, 2014 WL 5019639, *8, is inapposite because the ACC "alleges many facts that give rise to a partnership, including the fact that Grasso was vague about it."  (Opp'n. at 8.)  If Allen is suggesting that the allegation that Grasso failed to deny that the parties were partners supports the existence of a partnership, Allen is mistaken.  *See, e.g., MP Nexlevel of Cal., Inc.*, 2014 WL 5019639, *3 (while plaintiff alleged "[n]either CVIN nor CENIC took any steps to publicly deny the many statements of their partnership,'" court dismissed claims predicated on partnership).  Allen further contends *MP Nexlevel* "noted that its analysis would be different if 'one or both of [the alleged partners] failed to clarify the nature of their relationship.'"  (Opp'n. at 9.)  In fact, the referenced language says "[t]he Court's analysis *might* be different if" the alleged partners "*made affirmative representations* directly to [plaintiff] that [they] . . . were 'partners' and . . . failed to clarify the nature of their relationship."  *MP Nexlevel of Cal.*, 2014 WL 5019369, *8 n.8 (emphasis added).  The ACC, in contrast, nowhere says Grasso affirmatively represented that he and Allen were partners.

*Fourth*, Allen claims that "Counter-Defendants fail to mention that, before the court" granted summary judgment in *Love*, "the court first denied defendants' 12(b)(6) motion . . . ." (Opp'n. at 9 (citing *Love v. The Mail on Sunday*, No. CV-05779, 2006 WL 4046181, *4 (C.D. Cal. Nov. 16, 2006).) But the cited order simply said that, although a related, prior jury verdict did not collaterally estop the defendant from contesting the existence of a partnership, "there are . . . allegations in the complaint that suffice to allege that a partnership existed independent of the special verdict," without quoting those allegations. *Love*, 2006 WL 4046181, *4. The court also noted that "[w]hether the alleged partnership was terminated . . . cannot be resolved at this time in a motion to dismiss," suggesting the defendant's position was that the alleged partnership was somehow terminated. *Id.* As its rationale is unclear, the order cited by Allen is of little relevance.

### 3. "Additional surrounding circumstances"

Allen suggests that "additional surrounding circumstances," beyond the intent to share profits and the intent to jointly manage and control the business, can establish a partnership. (Opp'n. at 7-8.) Here, Allen claims, these include "Grasso's use of the word 'we,'" "Grasso's failure to ever controvert or otherwise challenge Allen's statements that the two were partners," "Grasso and Allen's key decision making relating to the best domain name," "name for their company," and so on, and "Grasso's affirmation in writing to a prospective investor that Grasso and Allen were working on a new startup together, as partners." (*Id.* (citing ACC ¶¶ 16, 17, 22, 34, 35, 37, 38).) As an initial matter, the ACC nowhere says Grasso wrote to a prospective investor that he and Allen were "partners" — rather, the cited text alleges only that Grasso suggested Allen write to a potential investor "Mitch and I are working on a new startup in the presentation space and I thought it might be interesting to connect you," *i.e.,* Grasso and the investor, "to discuss." (ACC ¶ 37.) As to the other allegations — Grasso's use of the word "we," omission to tell Allen they were not partners, and discussions regarding the Company's marketing — Plaintiffs explained why those are irrelevant to the elements of a partnership. (Mem. at 9-11.) Further, Allen's assertion that *In re Lona*, 393 B.R. 1 (Bankr. N.D. Cal. 2008), found a partnership "based on three letters wherein the parties used the word 'we'" mischaracterizes that case. Allen omits to mention an extensive list of factors *Lona* relied on in finding that the

1. defendants were legal partners, including that, *inter alia*, the defendant claiming not to be a
2. partner was "listed as the chief executive officer and sole director" of the alleged partnership, the
3. defendants executed an agreement that "identified [them] . . . as business partners," and the
4. defendant "informed [plaintiff] that she had invested $100,000 in" the partnership. *Id.* at 6, 10,
5. 12. Further, the letters referenced by Allen did not simply use the word "we" in referring to the
6. defendants — rather, they were jointly written by the defendants, and "ma[d]e it clear that" the
7. defendants "believed they were jointly responsible for the debt to" the plaintiff at issue. *Id.* at 15.

## II.   THE COPYRIGHT ACT PREEMPTS ALLEN'S CONVERSION CLAIM

Beyond the ACC's failure to plead a partnership or joint venture, Plaintiffs explained (Mem. at 7, 14-15) that Allen's conversion claim should be dismissed for the further reason that Allen failed to "specify the 'non-copyrightable partnership property' she contends forms the basis of her conversion claim" (8/31 Order, at 8 n.6). Allen responds, relying on *Brown v. Snapchat, Inc.*, No, CV 13-08569, 2014 WL 12573368 (C.D. Cal. Feb. 3, 2014), that "an out-partners' [sic] partnership claims under California state law contain several additional elements not found in the Copyright Act," as "'a partner's default rights under California state law include equal share in the profits and losses'" and "'equal rights in the management and conduct of the partnership business.'" (Opp'n. at 11 (quoting *Brown*, 2014 WL 12573368, *3).)

As an initial matter, the ACC's conversion claim does not mention any of the partnership-related rights listed in *Brown* — it merely says Grasso converted Allen's interests in "a business . . . over and above the software product" and "its non-copyrightable assets." (ACC ¶¶ 60, 61.) In any event, *Brown* made the quoted statement in discussing the plaintiff's claim for "breach of implied partnership/joint venture agreement," not his conversion claim. *Brown*, 2014 WL 12573368, *3. *Brown* nowhere suggested the "default rights" referenced by Allen are the type of property subject to a conversion claim. Likewise, Allen's reliance on *Second Measure*'s refusal to dismiss the plaintiff's conversion claim because the plaintiff sought "a share of the business's assets and profits," which is "the type of property that is the proper subject of a claim of conversion because it is of ascertainable value," is misplaced. *Second Measure*, 143 F. Supp. 3d at 981. The only "asset" of the Company identified in the ACC is its copyright relating to the

Software, which, of course, is not subject to a conversion claim.  (Mem. at 7.)  The ACC's conversion claim does not say anything about the Company's profits — in fact, the ACC repeatedly asserts that Allen expected to receive profits "down the road, if any," suggesting the Company has not made a profit.  (ACC ¶¶ 33, 35, 50(b), 51(c), 68(e), 81(d).)  Moreover, substantial copyright preemption authority holds that a right to receive profits from a copyrighted work, *i.e.*, the Software, is not subject to a conversion claim.  *See Ward v. Mitchell,* No. 12–cv–3932, 2013 WL 1758840, *5 (N.D. Cal. Apr. 24, 2013) ("[T]he rights asserted by [counterclaimant] 'to all profits and/or income that derives from the distribution and/or sale and/or licensing' of [band's] albums are equivalent to those protected by 17 U.S.C. § 106," and, "[a]s such, [counterclaimant's] conversion claim for profits from distribution of the albums is preempted."); *Worth v. Universal Pictures, Inc.*, 5 F. Supp. 2d 816, 822-23 (C.D. Cal. 1997) (as "Plaintiffs do not bring their conversion action for retrieval" of tangible property, "but rather for the profits from the movie's reproduction and distribution," they "fail to claim a 'physical deprivation'" and hence their "conversion claim is preempted by federal copyright law").

Finally, Allen claims the ACC "allege[s] that Grasso converted her interest to stock certificates," and cites *Fremont Indem. Co. v. Fremont Gen. Corp.*, 148 Cal. App. 4th 97 (2007), which held "[s]hares of stock are tangible" and therefore the proper subject of a conversion claim.  (Opp'n. at 12 (quoting *Fremont Indem. Co.*, 148 Cal. App. 4th at 122).)  But Allen does not claim to have ever owned shares in the Company, or that Grasso deprived her of them — rather, she claims Grasso "interfered with Allen's interests in the business and its non-copyrightable assets" by "putting the corporation's stock in his name."  (ACC ¶ 62(b).)  The ACC does not specify what property interests "the business" or "its non-copyrightable assets" consist of, and therefore fails to comply with the Court's directive that Allen "specify the 'non-copyrightable partnership property' she contends forms the basis of her conversion claim."  (8/31 Order, at 8 n.6.)

### III. ALLEN'S BREACH OF IMPLIED CONTRACT CAUSE OF ACTION IS PREEMPTED AND INADEQUATELY PLEADED

*First*, Allen claims the ACC alleges conduct creating an implied contract because it "alleges two plus years [sic] of conduct from which a . . . contract to work together, divide

responsibilities and share equally in any resulting benefits may be inferred." (Opp'n. at 14.)[1]  As Plaintiffs explained, the mere, alleged facts that the parties worked together, and Grasso used "we" in referring to himself and Allen, do not establish a contract to equally share profits.  (Mem. at 15-16.)  Allen responds by taking issue with Plaintiffs' reliance on the holding of *Landucci v. State Farm Ins. Co.*, 65 F. Supp. 3d 694 (N.D. Cal. 2014), that "vague assurances do not suffice to show an implied contract," claiming *Landucci*'s rationale was actually that "an HR representative's statement that Plaintiff would receive a pension if she were fired" did not create a contract because "[i]t is not a statement concerning employment status at all, but rather pensions." (Opp'n. at 15 (quoting *Landucci*, 65 F. Supp. 3d at 714).)  The fact that the alleged statement concerned pensions was one ground for the court's decision, but the court further held that, "[e]ven if" the statement "may have been construed by Plaintiff to mean that her employment was in some sense . . . permanent," the statement was a "vague assurance[]" incapable of giving rise to an implied contract.  *Landucci*, 65 F. Supp. 3d at 714.

*Second*, Allen disputes Plaintiffs' observation that the ACC's implied contract claim fails to set forth the terms of the purported contract, claiming "[n]othing in California law or Rule 8 requires specificity with respect to every term and how it was performed." (Opp'n. at 14.)  But the law certainly requires more specificity as to the agreement's terms than the description of the alleged contract in the ACC, which says only that Grasso was obligated "to share profits," and that there were "significant things that the contract required [Allen] to do," without setting forth what those "things" were.  (ACC ¶¶ 69, 73; *see also* Mem. at 16-17.)

*Third*, in response to Plaintiffs' contention that Grasso could not have breached his obligation "to share profits" because the ACC admits the Company has not made a profit (Mem. at 17), Allen asserts that, instead, Grasso's "obligation was to share with Allen all rewards from their efforts equally" (Opp'n. at 14).  The ACC's implied contract claim nowhere says Grasso had such an obligation, but in any event, the ACC does not make clear how Grasso's conduct

---

[1] Allen's repeated claim that, according to the ACC, she and Grasso worked together for "two plus years" (Opp'n. at 14) is inaccurate.  The ACC actually alleges that the parties worked together between April and December 2014 (ACC ¶¶ 11-23) and then "communications died off" (*id.* ¶ 24), and "more than a year later, in March 2016 . . . Grasso resurfaced to tell Allen he had been heads down [sic] working on Beautiful Slides" (*id.* ¶ 25).

amounted to a failure to share "rewards" with Allen, or even what "rewards" supposedly existed. (Mem. at 17.) Allen further claims "the Court has already rejected this argument," citing the Court's statement that Allen "alleges Grasso took 'for himself all profits and compensation that would have gone to [Allen],' . . . which, read in the light most favorable to Allen, the Court understands to allege profits were in fact earned." (Opp'n. at 15 (citing 8/31 Order, at 9 n.7).) But Allen neglects that, unlike the Counterclaim addressed in the Court's prior order, the ACC repeatedly alleges that Allen expected the parties "would be sharing profits down the road, if any," indicating the Company has yet to make a profit. (Mem. at 17.)

*Fourth*, Allen says this case "is far more similar" to *Second Measure* and *Moreno v. SFX Ent'mt., Inc.*, No. CV-14-0880, 2015 WL 4573226 (C.D. Cal. Jul. 29, 2015). (Opp'n. at 15.) Allen is mistaken. In *Second Measure*, the alleged conduct the court found sufficient to plead an implied partnership agreement included the parties' "agree[ment] to share ownership of the business," "sign[ing] [of] tandem non-disclosure agreements," "split[ting] [of] business costs," and "discuss[ion] [of] whether to incur certain business expenses." *Second Measure, Inc.*, 143 F. Supp. 3d at 978-79. Here, the parties made no such explicit acknowledgments of their co-ownership of the business. Similarly, *Moreno* denied summary judgment to the defendants based on a number of factors suggesting co-ownership of the alleged joint venture that are not present here, including the defendant's written "propos[al] [of] specific terms for what [defendant] call[ed] 'our deal,'" acceptance of the plaintiff's proposal that the plaintiff receive "1.5mm founder shares" in the alleged joint venture, and statement, in accepting the plaintiff's proposal, that, if the plaintiff "[a]sks anyone who has been part of any of our companies, . . . they will tell you that they made . . . money from the optional payments." *Moreno*, 2015 WL 4573226, *4-5.

### IV.  ALLEN'S FRAUD CAUSE OF ACTION FAILS TO PLEAD WITH PARTICULARITY

#### A.  Concealment or Suppression, and Intent to Defraud

Plaintiffs noted that Allen fails to explain why the Counterclaim's allegation that Grasso formed the intent to "cut Allen out" in September 2016 is now absent from the ACC, and replaced with a vague allegation "on information and belief" that, "if Grasso did not always

1  intend to keep the value of Beautiful Slides for himself, Grasso changed his mind and decided to
2  keep the value for himself." (Mem. at 19-20 (citing ACC ¶ 30).)  Rather than addressing this
3  issue, Allen replies that, "[t]o the extent Grasso argues that the issue of intent was not pled with
4  the requisite specificity under Rule 9, it did not have to be." (Opp'n. at 17-18.)  Regardless of the
5  specificity with which Allen must plead intent, Allen cannot contradict her prior pleading without
6  explanation. (Mem. at 19-20.)  Further, the ACC does not even "generally" allege facts reflecting
7  Grasso's fraudulent intent — only speculation "on information and belief," with no stated factual
8  basis.  *See Ovitz v. Chartis Prop. Cas. Co.*, No. CV 15-3916, 2015 WL 12746209, *8 (C.D. Cal.
9  Sept. 14, 2015) (fraud allegations on information and belief were insufficient, as "[t]he complaint
10  . . . must state the factual allegations on which it bases its belief") (citing *Neubronner v. Milken*, 6
11  F.3d 666, 672 (9th Cir. 1993)).

12         **B.**       **Duty to Disclose**

13         Allen claims to have sufficiently "allege[d] the time, place and nature of Grasso's
14  incomplete disclosures." (Opp'n. at 16.)  But Allen simply cites a series of alleged statements by
15  herself and Grasso from the ACC's "General Allegations" (*id.* at 16-17), and fails to respond to
16  Plaintiffs' observation that Allen's fraud cause of action nowhere says which communications
17  cited in the "General Allegations" form the basis for Allen's fraud claim (Mem. at 20-21).
18  Moreover, Allen improperly purports to explain, for the first time in her Opposition, what the
19  alleged communications omitted to disclose — *e.g.*, in stating in June 2014 that "a writing was
20  not required because the two were friends," Grasso "did not disclose that in fact, there was no
21  partnership and/or that she was a mere employee," and did not disclose, in using the word "we" in
22  June 2016, that "his reference to 'we' meant anything other than partners . . . ." (Opp'n. at 16-
23  17.)  *See Broam v. Bogan*, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003) ("In determining the propriety
24  of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving
25  papers, such as a memorandum in opposition to a defendant's motion to dismiss.").  Allen further
26  takes issue with Plaintiffs' citation to *Mohebbi v. Khazen*, 50 F. Supp. 3d 1234 (N.D. Cal. 2014),
27  and *Doll v. Stars Holding Co.*, No. C-05-1132, 2005 WL 2811767 (N.D. Cal. Oct. 27, 2005).
28  Allen claims *Mohebbi* is distinguishable because, there, "Plaintiff identified certain paragraphs as

setting forth the time, place and nature of defendants' misrepresentations, but the court noted 'these paragraphs do not in fact include any such information.'" (Opp'n. at 17 (quoting *Mohebbi*, 50 Supp. 3d at 1256).) But that is also true here — not only does the ACC's fraud claim, as in *Mohebbi*, fail to specify which of the "General Allegations" it is based on, but also Allen improperly attempts to cure that deficiency in her Opposition. Allen further purports to distinguish *Doll* on the ground that it "refused to address the adequacy of plaintiff's state law claims, including fraud, for lack of jurisdiction." (Opp'n. at 17.) But the fact that *Doll* dismissed federal-law fraud claims, rather than state-law ones, based on the plaintiff's vague reliance on "General Allegations," *Doll*, 2005 WL 2811767, *2, plainly is not a material distinction.

### C. Detrimental Reliance

Allen insists that "[t]he Amended Counterclaim routinely alleges how Allen relied on Grasso's comments in expending more time and effort on the project." (Opp'n. at 18.) In fact, only one paragraph cited by Allen claims reliance by her, alleging "Allen reasonably relied" on Grasso's June 2014 statement that "he had no intent to 'screw over' Allen" "in continuing to do work . . . with expectations of sharing profits thereof." (ACC ¶ 20.) As Plaintiffs explained, if Grasso did not form the intent to "cut Allen out" of the Company until September 2016, Grasso could not have "fraudulently concealed" that intent by way of the June 2014 statement, and thus the June 2014 statement cannot form the basis for Allen's cause of action. (Mem. at 19, 21.) The remaining, cited paragraphs (ACC ¶¶ 15, 18, 26, 81(d)) say nothing about Allen's detrimental reliance. Likewise, Allen's contention that, had she known of Grasso's intent to "cut her out," "she would have demanded a partnership agreement in writing," or "backed out of the partnership and worked on developing her own software" (Opp'n. at 18), does not appear in the ACC.

Dated: October 23, 2017  **SEUBERT FRENCH FRIMEL & WARNER LLP**

By: /s/ William J. Frimel

WILLIAM J. FRIMEL
Attorneys for Plaintiffs and Counterclaim-Defendants BEAUTIFUL SLIDES, INC. and MITCH GRASSO