1  Gregory J. Wood (CA SBN 200780)
   gwood@woodrobbins.com
2  B. Douglas Robbins (CA SBN 219413)
   drobbins@woodrobbins.com
3  Kristen E. Drake (CA SBN 202827)
   kdrake@woodrobbins.com
4  WOOD ROBBINS, LLP
   One Post Street, Suite 800
5  San Francisco, CA 94104
   T: (415) 247-7900
6  F: (415) 247-7901

7  Attorneys for Defendant and Counterclaimant
   MAY ALLEN
8

9              UNITED STATES DISTRICT COURT

10       FOR THE NORTHERN DISTRICT OF CALIFORNIA

11  BEAUTIFUL SLIDES, INC., a Delaware       Case No.: 3:17-cv-01091-MMC
    corporation; and MITCH GRASSO, an
12  individual,                              **DEFENDANT AND
                                             COUNTERCLAIMANT MAY ALLEN'S
13              Plaintiffs,                   OBJECTIONS AND RESPONSES TO
                                             PLAINTIFFS AND COUNTERCLAIM-
14  v.                                       DEFENDANTS' FIRST SET OF
                                             INTERROGATORIES**
15  MAY ALLEN, an individual,

16              Defendant.

17  AND RELATED CROSS ACTION

18

19

20

21

22

23

24

25

26

27

28

                              1

**PROPOUNDING PARTY:** Plaintiffs BEAUTIFUL SLIDES, INC. and MITCH GRASSO

**RESPONDING PARTY:**   Defendant MAY ALLEN

**SET NO.:**                        One

TO PLAINTIFFS BEAUTIFUL SLIDES, INC. AND MITCH GRASSO ("Plaintiffs") AND THEIR ATTORNEYS OF RECORD:

Defendant MAY ALLEN ("Allen") hereby responds, objects and otherwise responds to Plaintiffs' First Set of Interrogatories ("Interrogatories") as follows:

## PRELIMINARY STATEMENT

1.      Allen's responses to the Interrogatories are made solely for the purpose of this action. Each response is made subject to all objections as to competence, relevance, materiality, propriety, admissibility, privilege, privacy, proprietary information, trade secrets and the like, and any and all other objections on grounds that would require the exclusion of any response herein if such were offered in Court, all of which objections and grounds are reserved and may be interposed at anytime, including at the time of trial.

2.      No incidental or implied admissions are intended in these responses. Allen's response to any Interrogatory should not be taken as an admission that Allen accepts or admits the existence of any fact(s) or any document(s) assumed by that Interrogatory or that such response constitutes admissible evidence. Allen's response to any such Interrogatory is not intended to be, and shall not be construed as, a waiver by Allen of any or all objection(s) to the Interrogatory.

3.      Allen has not completed her (a) investigation of the facts relating to this case, (b) discovery in this action, or (c) preparation for trial. The following responses are based upon information known at this time and are given without prejudice to Allen's right to amend, supplement or revise these responses with any subsequently discovered information.

## GENERAL OBJECTIONS

Allen makes and hereby incorporates by reference the following general objections, whether or not separately set forth, in response to each Interrogatory: Allen objects to each

2

1   Interrogatory to the extent that it seeks information protected by the attorney-client privilege, the

2   work-product doctrine, a confidentiality agreement, or information that is otherwise privileged,

3   protected or confidential pursuant to any applicable doctrine, statute or rule. Such responses as

4   may hereafter be given shall not include any information protected by such privileges, doctrines,

5   statutes or rules, and any inadvertent disclosure of such information shall not be deemed a waiver

6   of any such privilege, protection or confidentiality.

7                            RESPONSES TO PLAINTIFFS' INTERROGATORIES

8   INTERROGATORY NO. 1:

9          Identify Any features of the Software created by You, whether those features were

10  incorporated into the current version of the Software or any prior one.

11  **RESPONSE TO INTERROGATORY NO. 1:**

12         Allen incorporates by reference her Preliminary Statement and General Objections set

13  forth above. Allen further objects to the term "feature" as being vague and ambiguous. Subject to

14  and without waiving her objections, and defining "feature" as including "functions, features,

15  uses, aspects, and graphical/textual elements," Allen responds as follows:

16         The Software was created by the partnership formed by Allen and Grasso. Allen and

17  Grasso were partners and together they created and developed the Software. As Allen has not

18  used the current version of the Software, her response to this interrogatory is based on a version

19  of the software she saw in approximately October 2016.  The design elements, or features, the

20  partnership created include drop and drag functionality which resulted in automatic resizing of

21  photos, graphics, and text as materials are added and removed from slides, the blue user

22  interface, creation and design of the templates, functioning of different templates, creation and

23  design of themes, functionality and adjustments to themes, and other fluid, interactive design

24  elements. The partnership further developed a corporate look and brand, along with custom slide

25  templates and themes, incorporating various fonts, colors and graphic design elements.

26  **INTERROGATORY NO. 2:**

27         Identify the "key differentiating features" of the Software created by You, as referenced

28  in Paragraph 13 of the Counterclaim.

**INTERROGATORY NO. 2:**

Allen incorporates by reference her Preliminary Statement and General Objections set forth above. Allen further objects to the term "feature" as being vague and ambiguous. Allen additionally objects as the Counterclaim is no longer the operative pleading in this action. Subject to and without waiving her objections, and defining "feature" as including "functions, features, uses, aspects, and graphical/textual elements," Allen responds as follows:

The Software was created by the partnership formed by Allen and Grasso. Allen and Grasso were partners and together they created and developed the Software. As Allen has not used the current version of the Software, her response to this interrogatory is based on a version of the software she saw in approximately October 2016. Further, the phrase "key differentiating features" is not included in the operative Amended Counterclaim. The reference to "key differentiating features" in the original counterclaim referred to the partnership's development of original design and functionality of slides that auto-adjusted element size and position as new elements are added or removed based on templates. Grasso subsequently integrated the design and functionality into code and upon completion and said to Allen that it looked just like the mock-ups that Allen had designed, and further, that Allen was going to love it.

**INTERROGATORY NO. 3:**

Identify Any features You identified in response to Interrogatory No. 1 that are incorporated into the current version of the Software.

**RESPONSE TO INTERROGATORY NO. 3:**

Allen incorporates by reference her Preliminary Statement and General Objections set forth above. Allen further objects to this interrogatory on the grounds that the information is not in her possession, custody and control. Subject to and without waiving her objections, and defining "feature" as including "functions, features, uses, aspects, and graphical/textual elements," Allen responds as follows:

The Software was created by the partnership formed by Allen and Grasso. Allen and Grasso were partners and together they created and developed the Software. As Allen has not used the current version of the Software, her response to this interrogatory is based on a version

4

1  of the software she saw in approximately October 2016. The design elements, or features, the

2  partnership created include drop and drag functionality which resulted in automatic resizing of

3  photos, graphics, and text as materials are added and removed from slides, the blue user

4  interface, creation and design of the templates, functioning of different templates, creation and

5  design of themes, functionality and adjustments to themes, and other fluid, interactive design

6  elements. The partnership further developed a corporate look and brand, along with custom slide

7  templates and themes. incorporating various fonts. colors and graphic design elements.

8  **INTERROGATORY NO. 4:**

9      If You claim to have authored software code that was incorporated into Any version of

10  the Software, identify the software code You authored.

11  **RESPONSE TO INTERROGATORY NO. 4:**

12      Allen incorporates by reference her Preliminary Statement and General Objections set

13  forth above. Subject to and without waiving her objections, Allen responds as follows:

14      The Software was created by the partnership formed by Allen and Grasso. Allen and

15  Grasso were partners and together they created and developed the Software. Allen does not claim

16  to have written the code personally but does claim to be a joint author in the code. The working

17  relationship between Grasso and Allen was such that Allen developed ideas, designs, functions,

18  and graphical materials, such as electronic sketches and text—discussed in greater detail in the

19  interrogatory response below. These "features" or "elements" were then integrated into the code

20  as transcribed by Grasso. Allen would then often make further refinements, to the software after

21  conducting bug tests, instructing Grasso yet again how to change the functions and highlighting

22  errors to correct. Many of Allen's instructions, fixes and improvements were themselves reduced

23  to a tangible medium such as text or Trello notes. In some instances, Allen would create and

24  develop design features and functionality for the Software that was coded by Grasso. In other

25  instances, both Allen and Grasso would develop design features and functionality for the

26  Software that was coded by Grasso.

27      Because Allen has not used the current version of the Software, her response to this

28  interrogatory is based on a version of the software she saw in approximately October 2016.

5

**INTERROGATORY NO. 5:**

Identify the "still and moving animations, sketches, and scripts" referenced in Paragraph 64 of the Counterclaim.

**RESPONSE TO INTERROGATORY NO. 5:**

Allen incorporates by reference her Preliminary Statement and General Objections set forth above. Allen additionally objects as the Counterclaim is no longer the operative pleading in this action. Subject to and without waiving her objections, Allen responds as follows:

The Amended Counterclaim is no longer the operative pleading. The phrase "still and moving animations, sketches, and scripts" is referenced in Paragraph 95 of the Amended Counterclaim. Pictures of the "still and moving animations, sketches, and scripts" are produced in response to the accompanying document production requests as documents Bates Stamped Allen 1-30, in addition to a folder called "fonts" and another folder called "Detailed downloads of animations from 2015 Evernote Folder".

**INTERROGATORY NO. 6:**

Identify how, if at all, the "still and moving animations, sketches, and scripts," if any, that You identified in response to Interrogatory No. 5 have been used by the Company.

**RESPONSE TO INTERROGATORY NO. 6:**

Allen incorporates by reference her Preliminary Statement and General Objections set forth above. Allen further objects to this interrogatory on the grounds that the information is not in her possession, custody and control. Subject to and without waiving her objections, Allen responds as follows:

The Software was created by the partnership formed by Allen and Grasso. Allen and Grasso were partners and together they created and developed the Software. As Allen has not used the current version of the Software, her response to this interrogatory is based on a version of the software she saw in approximately October 2016. Allen also notes that even if the "still and moving animations, sketches, and scripts" are not evident in the final version of the Software, they still could have been "used by the Company" in a variety of ways, including the following (a) "used by the Company" for development in future products; (b) "used by the

6

1  Company" as a trade secret that was never released and will not be released; and, (c) "used by

2  the Company" in various prior versions of the Software but later removed by the Company in

3  some more recent version—which was itself only possible after having passed through prior

4  iterations. In these cases Allen lacks complete information as to all possible ways in which her

5  work has been "used by the Company." The Company itself would be in a superior position to

6  know all the ways in which Allen's work has been "used by the Company."

7  INTERROGATORY NO. 7:

8       Identify how, if at all, the "Beautiful Slides Identity" referenced in Paragraph 68 of the

9  Counterclaim has been used by the Company.

10  **RESPONSE TO INTERROGATORY NO. 7:**

11       Allen incorporates by reference her Preliminary Statement and General Objections set

12  forth above. Allen further objects to this interrogatory on the grounds that the information is not

13  in her possession, custody and control. Allen additionally objects as the Counterclaim is no

14  longer the operative pleading in this action. Subject to and without waiving her objections, Allen

15  responds as follows:

16       The Amended Counterclaim is no longer the operative pleading. The phrase "Beautiful

17  Slides Identity" is referenced at Paragraph 99 of the Amended Counterclaim. Allen notes that

18  even if the "Beautiful Slides Identity" is not evident in the final version of the Software, it still

19  could have been "used by the Company" in a variety of ways, including the following: (a) "used

20  by the Company" for development in future products; (b) "used by the Company" as a trade

21  secret that was never released and will not be released; and, (c) "used by the Company" in

22  various prior versions of the Software but later removed by the Company in some more recent

23  version—which was itself only possible after having passed through prior iterations. In these

24  cases Allen lacks complete information as to all possible ways in which her work has been "used

25  by the Company." The Company itself would be in a superior position to know all the ways in

26  which Allen's work has been "used by the Company."

27       The Software was created by the partnership formed by Allen and Grasso. Allen and

28  Grasso were partners and together they created and developed the Software. As Allen has not

1  used the current version of the Software, her response to this interrogatory is based on a version

2  of the software she saw in approximately October 2016. The Beautiful Slides Identity, or

3  ultimate tagline for the product, "WORK SMART. WORK SIMPLE. WORK BEAUTIFUL,"

4  has been used by the Company in the past on its website. Upon information and belief, it was

5  also used when trying to procure funding for the company and when trying to position the initial

6  version of the product. Again, upon information and belief, it was only upon the filing of the

7  Instant Action that the tagline was from the website. Portions of the tagline, such as "work

8  smart" or "work beautiful" still exist as promotional material on the Company's website. Beyond

9  the website the Beautiful Slides Identity and/or derivative works based on the Beautiful Slides

10  Identity may continue to be used in other Company promotional material currently unknown to

11  Allen but known, and yet not revealed by the Company. For these reasons, upon information and

12  belief, the original tagline and/or derivative versions of the tagline continue to be used internally

13  and externally by the Company. Only the Company's cooperation in further discovery will allow

14  Allen to reveal whether the Beautiful Slides Identity and/or derivative works based on the

15  Beautiful Slides Identity is being "used by the Company."

16  **INTERROGATORY NO. 8:**

17       Identify the amount of damages You claim to have suffered as a result of the conduct

18  attributed to Grasso and the Company in the Counterclaim.

19  **RESPONSE TO INTERROGATORY NO. 8:**

20       Allen incorporates by reference her Preliminary Statement and General Objections set

21  forth above. Subject to and without waiving her objections, Allen responds as follows:

22       Allen does not know the "amount" at this time. Party and third-party discovery is

23  required to determine the amount of damages for each category. To date, Plaintiff Mitch Grasso

24  has refused to sit for deposition, and documents have not been received by third-parties pursuant

25  to the issued subpoenas.

26       That being said, Allen's damages include, but are not limited to those resulting from

27  Counterclaimants' breaches of their obligations, including: (1) 50% of the equity/value/potential

28  value of Beautiful Slides, Inc. and/or its assets, (2) any losses incurred due to use of copyrights

1  or trademarks authored or co-authored by Allen without her consent; and 3) any lost

2  compensation. Defendant/Counterclaimant will also move to recover statutory penalties/punitive

3  damages as appropriate, and costs incurred to in the suit. This is in additional to any other

4  damages to be discovered and proved at trial.

5  **INTERROGATORY NO. 9:**

6  Identify the method You used to compute the amount of damages set forth in Your

7  response to Interrogatory No. 8 above.

8  **RESPONSE TO INTERROGATORY NO. 9:**

9  Allen incorporates by reference her Preliminary Statement and General Objections set

10  forth above. Subject to and without waiving her objections. Allen responds as follows:

11  There is no "method" at this time. As stated above, party and third-party discovery is

12  required to determine the amount of damages for each category. This must come before

13  employing any method of calculation. To date, Plaintiff Mitch Grasso has refused to sit for

14  deposition, and documents have not been received by third-parties pursuant to the issued

15  subpoenas.

16  **INTERROGATORY NO. 10:**

17  Identify the actions, if any, that You took in reliance on the misrepresentations and/or

18  failures to disclose upon which Your Fourth Cause of Action for "Fraud by Intentional

19  Misrepresentation and Concealment" is based.

20  **RESPONSE TO INTERROGATORY NO. 10:**

21  Allen incorporates by reference her Preliminary Statement and General Objections set

22  forth above. Subject to and without waiving her objections, Allen responds as follows:

23  Allen incorporates by this reference the allegations of her Amended Counterclaim, which

24  provide, after Allen and Grasso agreed to partner in April 2014, they brainstormed and Allen

25  came up with a differentiating idea for presentation software, slides that auto-adjusted element

26  size and position as new elements are added or removed based on templates. Grasso loved it. The

27  parties' partnership had a direction: develop the product and the business around it.

28

9

1   Grasso and Allen expressly divided management and control of partnership business

2   based on their respective talents. Grasso managed and controlled the coding of the software with

3   help and direction from Allen, and he agreed to do that work. Allen managed and controlled the

4   software's design and product/company positioning with help and direction from Grasso, and she

5   agreed to do that work. Though they did not expressly say "we will share the profits of our work,

6   if any" the reasonable implication to Allen from their discussion and agreements was that they

7   would share in any rewards from their combined efforts.

8   Pursuant to their discussion and agreed division of labor, on May 28, 2014, Allen began

9   work on a 'y combinator' application, that is, to apply to be a part of the very successful 'y

10  combinator' family of startups. On May 28, 2014, Allen created the initial landing pages for the

11  company's product/website. On May 30, 2014, Allen developed feature lists for the product. On

12  June 3, 2014, Allen created the positioning statement for the company, and outlined the

13  company's plan for distribution and user acquisition. On June 4, 2014, Allen decided on

14  templates, three of four of which are used today, and began designing the templates. Meanwhile,

15  Grasso worked on coding the product to meet Allen's design ideas and specifications.

16  On June 4, 2014, Grasso sent Allen an email linking to an article about new, potentially

17  competing, presentation software. Allen responded to Grasso, "That's really close to what we're

18  doing. What are your thoughts about that?" Grasso responded simply, "That it's a good idea."

19  Following that conversation, Allen continued work on product design and company

20  positioning. Allen researched different pricing models, comparing free downloaded applications

21  with in-app purchases versus pay-to-download applications and discussed them with Grasso.

22  Allen favored pay-to-download. Grasso responded, "Ok. That makes sense." Grasso asked for

23  clarification from Allen and Allen gave it.

24  On June 8, 2014, Allen wrote to Grasso asking to talk about company structure and

25  funding. On June 9, 2014, the parties met at Starbucks to discuss the same. At that discussion,

26  Allen suggested the parties enter into a written agreement memorializing their partnership.

27  Grasso did not controvert that the parties were partners, nor co-founders in a new joint venture,

28  nor do anything to suggest that the spoils from the effort would be all or mostly all his. Instead,

10

Grasso responded that a writing was unnecessary because Allen and Grasso were friends. Grasso added that there was trust in the relationship, and that he had no intent to "screw over" Allen. Allen reasonably relied on this discussion, and Grasso's representations, in continuing to do work as a partner in the partnership with expectations of sharing profits thereof.

On June 17, 2014, Allen completed making a video of exactly how the new software program would operate, so that Grasso would have something tangible to code to. In September 2016, Allen proposed positioning the product and company for Salesforce integration. In referring to a competitor's failed attempt, Allen wrote, "<u>we could build it better I'm sure.</u>" Allen did not write, "you could…" Grasso did not respond, "you mean *I* could…" nor anything to that effect. Grasso responded, "I guess, seems too small."[1] Again, the two conversed as partners working together to develop the software and business. The reasonable implication to Allen was that they would share the bounty of their work. In December 2014, Grasso sent Allen a link to a very early version of the application. That link still works today.

It was not until more than a year later, in March 2016, when Grasso resurfaced to tell Allen that he had been heads down working on Beautiful Slides. Grasso wrote specifically, "you'll like it. it's all fluid and animated – like in the mockup you did." Grasso then told Allen a challenge in getting the software to work. Allen naturally offered to help him with it and Grasso accepted her help. At that moment, the parties' joint venture for profit was revived, as were each partner's respective roles in that partnership and expectations therefrom.

Allen, as partner-in-charge of product design and company positioning, took the lead to take the product to the next level. Allen recruited beta testers to use the software. She recorded their comments and videotaped them using the software so Grasso could see it. Using Trello, Slack, text messaging, and in person conversations, Allen assigned tasks to Grasso respecting changes that needed to be made, and Grasso made the changes. Allen herself user-tested the product and provided feedback to Grasso. This went on for months.

---

[1] Ironically, a company affiliated with Salesforce later offered $10 million for Beautiful Slides, reflecting Allen's insight into product design and product/company positioning, and Grasso's incompetence in both areas.

1      The partners debated the best domain name and name for their company. Allen proposed

2 sending out a poll to her professional network, and Grasso agreed. Allen and Grasso also

3 consulted on who to hire as a potential CTO, and other employees. Allen investigated office

4 space. This work also went on for months.

5      Through the above-referenced beta-testing, the product got better, to a point where it

6 could be shown to potential investors. Grasso advised Allen that he had been speaking and had a

7 scheduled a meeting with a potential investor. In so doing, Grasso assumed management and

8 control of investor communications and further strategic planning for the partnership. Allen did

9 not challenge Grasso taking on this new role. Allen was working for a company called Projector.

10      Grasso's conversations with potential investors went well, very well, and it is at this point

11 Allen alleges on information and belief, if Grasso did not always intend to keep the value of

12 Beautiful Slides for himself, Grasso changed his mind and decided to keep the value for himself.

13 And yet Grasso continued to make representations and act in a way that would lead the

14 reasonable person, and did lead Allen, to believe, that two were working together and would

15 share profits from that work.

16      Grasso expressed concern, for example, about Allen's ability to contribute sufficient time

17 to the effort. Specifically:

18      a.    By July 7, 2017, Grasso had increased his time commitment and wanted Allen

19                to confirm her availability. Grasso asked Allen how much time she can commit.

20                Allen responded 10-15 hours a week. Grasso accepted that, and asked Allen to

21                further develop the website landing page, marketing verbiage and to continue to

22                provide feedback on the product features and user interface, as she had been

23                doing.

24      b.    On August 3, 2016, Grasso again pressed Allen about her time commitment.

25                Grasso asked if she really had the bandwidth given that she has a full-time job

26                at Projector. Allen responded to the effect that she will find the bandwidth.

27                Grasso accepted that, saying "Ok," and proceeded to advise Allen on

28                developments on the investor communications.

As far as Allen was concerned, Grasso's anxiety over her availability to do work was justified only because there was a joint expectation that they would be sharing profits down the road, if any. Grasso's anxiety was typical partner anxiety, where one partner is concerned that the other is pulling their weight. Grasso had not offered any compensation to Allen for her work otherwise and had no basis to be anxious about her time commitment but for ultimate profit sharing. Grasso's anxiety also reflects how much Grasso needed someone else to get the product and the company to the investor market, namely, Allen.

Grasso also continued to use the "we" reference, in present and future tense. Specifically:

a.   Before the first time commitment discussion referenced above, at the end of June 2016, Grasso discussed a meeting that he had with an investor saying the investor thought "we could raise $$ in 1.3 secs easy," adding, "i have a feeling the valuation won't differ that much across VCs but if we can pick who we work with that'd be nice."

b.   After the first time Grasso expressed anxiety about Allen's time commitment, Allen asked Grasso where she should focus her time as between the marketing site and helping Grasso with the user interface. Grasso suggested the user interface was more important, again using the pronoun "we". He specifically asked Allen if she can do some mock-ups of themes and said, "getting another designers (ie you) perspective on the "edges" of where we might want to go with the theming would be helpful." He added, "and, fyi, if we want to seamlessly migrate your mockups into actual themes... - you should consider using fonts available on..."

c.   On July 8, 2017, Grasso asked Allen, "id like us to get a list together of what we collectively feel is missing from the current build in order to feel good about showing it off. showstopper/annoying bugs, UX quirks, missing template options, etc." Allen agreed and they meet for that purpose. They started using a Trello board, to track all the bug fixes isolated by Allen and communicate them to Grasso. Some fifty-two Trello cards were created by Allen finding bugs and

13

1      suggesting fixes.[2]

2      d.      On July 14, 2016, Allen wrote to Grasso about the product, "can you tell me

3      more about where we're going with the new UI... are we moving away from the

4      'variations' pattern that can be applied from the slide?" Grasso didn't correct

5      Allen and say for example, "You mean where *I* am going…" Grasso answered

6      with his thoughts.

7      e.      Towards the end of July 2016, in response to one of Allen's marketing ideas for

8      the demo, Grasso acknowledges the value in Allen's proposal and confirms,

9      saying "we show both the good design and the easy interactivity in one, I like

10      it." Grasso was suggesting to Allen that they would be showing the product

11      together, in the future.

12      f.      On August 4, 2016, Allen proposed quitting her job at Projector to work full-

13      time on Beautiful Slides. Allen is informed and believes that Grasso,

14      independently wealthy, was nervous about Allen, not independently wealthy,

15      quitting her job since there was no way to pay the partners at that time. Grasso

16      responded to the effect, not yet, "hopefully we can get there soon." Allen and

17      Grasso went on to talk about more user testing feedback.

18      Grasso's use of the "we" in the present and future tense, coupled with the fact that she

19 was not receiving compensation otherwise, further cemented Allen's expectations as alleged

20 herein that the two were working together and would share profits from that work if any, as did

21 what followed.

22      On August 11, 2016, Allen proposed introducing Grasso to one of her investor contacts

23 and asked Grasso if it was okay to refer to them as working together on Beautiful Slides. Grasso

24 agreed that it was fine. Allen then sent a draft letter for Grasso's approval, which said:

25

26 _____

27

28 [2] Many of these fixes involved copyrightable text authored by Allen and then directly integrated into the application by Grasso.

14

I hope you're well. I wanted to update you on a side project I am working on with an old coworker from Sliderocket. We're in the early stages of raising capital and we would love the opportunity to show a16z what we've built. I know you have been a fan of SlideRocket in the past, and what we're building now is another presentation tool.

We think there's a lot of room to grow in the enterprise productivity space, and we're focused on building a great user experience to start. We have a product in private beta and there is a lot of interest from the people we've shown it to.

We would love to schedule a meeting to see if there's a fit to work with your firm. If you're up for it, I would introduce Mitch Grasso, who would be taking the meeting as I am currently working at another company.

Upon receiving this text, Grasso did not object to the characterization of the two of them working together, nor suggest that was misleading. To the contrary, in proposing a more direct approach, Grasso maintained that aspect of it, proposing:

I'd like to introduce you to Mitch Grasso, who was the founder of SlideRocket and sold to VMware a few years ago. Mitch and I are working on a new startup in the presentation space and I thought it might be interesting to connect you to discuss.

In August and going into early September 2016, Grasso and Allen discussed investment from several investors. After Grasso had hard commitments for money, Grasso still used "we" in referring to the who owned the business. In continuing the discussion about possible names in early September 2016, for example, Grasso said "if we go down that path, there are better names, I'd think." This discussion is followed by Allen proposing the tagline "work smart, simply and beautiful," a form of which is still being used today.

1      It was not until mid-September 2016, after hard money commitments came in, that

2  Grasso changed his tune. On about September 12, 2016, Grasso and Allen discussed Allen's

3  potential compensation if she left Projector and started working on Beautiful Slides full-time.

4  After talking about salary, Allen said, "I think the equity is a trickier discussion and as you know

5  I want to be involved in a meaningful way."

6  Grasso immediately began a campaign to diminish Allen's contributions, in hopes of bullying

7  her into taking a *de minimus* share.

8  **INTERROGATORY NO. 11:**

9      Identify the work You performed in connection with Any aspect of the Software.

10  **RESPONSE TO INTERROGATORY NO. 11:**

11      Allen incorporates by reference her Preliminary Statement and General Objections set

12  forth above. Subject to and without waiving her objections, Allen responds as follows:

13      Allen incorporates by this reference the allegations of her Amended Counterclaim, which

14  provide, after Allen and Grasso agreed to partner in April 2014, they brainstormed and Allen

15  came up with a differentiating idea for presentation software, slides that auto-adjusted element

16  size and position as new elements are added or removed based on templates. Grasso loved it. The

17  parties' partnership had a direction: develop the product and the business around it.

18      Grasso and Allen expressly divided management and control of partnership business

19  based on their respective talents. Grasso managed and controlled the coding of the software with

20  help and direction from Allen, and he agreed to do that work. Allen managed and controlled the

21  software's design and product/company positioning with help and direction from Grasso, and she

22  agreed to do that work. Though they did not expressly say "we will share the profits of our work,

23  if any" the reasonable implication to Allen from their discussion and agreements was that they

24  would share in any rewards from their combined efforts.

25      Pursuant to their discussion and agreed division of labor, on May 28, 2014, Allen began

26  work on a 'y combinator' application, that is, to apply to be a part of the very successful 'y

27  combinator' family of startups. On May 28, 2014, Allen created the initial landing pages for the

28  company's product/website. On May 30, 2014, Allen developed feature lists for the product. On

1   June 3, 2014, Allen created the positioning statement for the company, and outlined the

2   company's plan for distribution and user acquisition. On June 4, 2014, Allen decided on

3   templates, three of four of which are used today, and began designing the templates. Meanwhile,

4   Grasso worked on coding the product to meet Allen's design ideas and specifications.

5            On June 4, 2014, Grasso sent Allen an email linking to an article about new, potentially

6   competing presentation software. Allen responded to Grasso, "That's really close to what we're

7   doing. What are your thoughts about that?" Grasso responded simply, "That it's a good idea."

8            Following that conversation, Allen continued work on product design and company

9   positioning. Allen researched different pricing models, comparing free downloaded applications

10  with in-app purchases versus pay-to-download applications and discussed them with Grasso.

11  Allen favored pay-to-download. Grasso responded, "Ok. That makes sense." Grasso asked for

12  clarification from Allen and Allen gave it.

13           On June 8, 2014, Allen wrote to Grasso asking to talk about company structure and

14  funding. On June 9, 2014, the parties met at Starbucks to discuss the same. At that discussion,

15  Allen suggested the parties enter into a written agreement memorializing their partnership.

16  Grasso did not controvert that the parties were partners, nor co-founders in a new joint venture,

17  nor do anything to suggest that the spoils from the effort would be all or mostly all his. Instead,

18  Grasso responded that a writing was unnecessary because Allen and Grasso were friends. Grasso

19  added that there was trust in the relationship, and that he had no intent to "screw over" Allen.

20  Allen reasonably relied on this discussion, and Grasso's representations, in continuing to do

21  work as a partner in the partnership with expectations of sharing profits thereof.

22           On June 17, 2014, Allen completed making a video of exactly how the new software

23  program would operate, so that Grasso would have something tangible to code to. In September

24  2016, Allen proposed positioning the product and company for Salesforce integration. In

25  referring to a competitor's failed attempt, Allen wrote, "we could build it better I'm sure." Allen

26  did not write, "you could…" Grasso did not respond, "you mean I could…" nor anything to that

27  ///

28  ///

17

effect. Grasso responded, "I guess, seems too small."[3] Again, the two conversed as partners working together to develop the software and business. The reasonable implication to Allen was that they would share the bounty of their work. In December 2014, Grasso sent Allen a link to a very early version of the application. That link still works today.

It was not until more than a year later, in March 2016, when Grasso resurfaced to tell Allen that he had been heads down working on Beautiful Slides. Grasso wrote specifically, "you'll like it. it's all fluid and animated – like in the mockup you did." Grasso then told Allen a challenge in getting the software to work. Allen naturally offered to help him with it and Grasso accepted her help. At that moment, the parties' joint venture for profit was revived, as were each partner's respective roles in that partnership and expectations therefrom.

Allen, as partner-in-charge of product design and company positioning, took the lead to take the product to the next level. Allen recruited beta testers to use the software. She recorded their comments and videotaped them using the software so Grasso could see it. Using Trello, Slack, text messaging, and in person conversations, Allen assigned tasks to Grasso respecting changes that needed to be made, and Grasso made the changes. Allen herself user-tested the product and provided feedback to Grasso. This went on for months.

The partners debated the best domain name and name for their company. Allen proposed sending out a poll to her professional network, and Grasso agreed. Allen and Grasso also consulted on who to hire as a potential CTO, and other employees. Allen investigated office space. This work also went on for months.

Through the above-referenced beta-testing, the product got better, to a point where it could be shown to potential investors. Grasso advised Allen that he had been speaking and had a scheduled a meeting with a potential investor. In so doing, Grasso assumed management and control of investor communications and further strategic planning for the partnership. Allen did not challenge Grasso taking on this new role. Allen was working for a company called Projector.

---

[3] Ironically, a company affiliated with Salesforce later offered $10 million for Beautiful Slides, reflecting Allen's insight into product design and product/company positioning, and Grasso's incompetence in both areas.

1   Grasso's conversations with potential investors went well, very well, and it is at this point
2   Allen alleges on information and belief, if Grasso did not always intend to keep the value of
3   Beautiful Slides for himself, Grasso changed his mind and decided to keep the value for himself.
4   And yet Grasso continued to make representations and act in a way that would lead the
5   reasonable person, and did lead Allen, to believe, that two were working together and would
6   share profits from that work.

7   Grasso expressed concern, for example, about Allen's ability to contribute sufficient time
8   to the effort. Specifically:

9   a.   By July 7, 2017, Grasso had increased his time commitment and wanted Allen
10       to confirm her availability. Grasso asked Allen how much time she can commit.
11       Allen responded 10-15 hours a week. Grasso accepted that, and asked Allen to
12       further develop the website landing page, marketing verbiage and to continue to
13       provide feedback on the product features and user interface, as she had been
14       doing.

15   b.   On August 3, 2016, Grasso again pressed Allen about her time commitment.
16       Grasso asked if she really had the bandwidth given that she has a full-time job
17       at Projector. Allen responded to the effect that she will find the bandwidth.
18       Grasso accepted that, saying "Ok," and proceeded to advise Allen on
19       developments on the investor communications.

20   As far as Allen was concerned, Grasso's anxiety over her availability to do work was
21   justified only because there was a joint expectation that they would be sharing profits down the
22   road, if any. Grasso's anxiety was typical partner anxiety, where one partner is concerned that
23   the other is pulling their weight. Grasso had not offered any compensation to Allen for her work
24   otherwise and had no basis to be anxious about her time commitment but for ultimate profit
25   sharing. Grasso's anxiety also reflects how much Grasso needed someone else to get the product
26   and the company to the investor market, namely, Allen.

27   Grasso also continued to use the "we" reference, in present and future tense. Specifically:
28   a.   Before the first time commitment discussion referenced above, at the end of

19

June 2016, Grasso discussed a meeting that he had with an investor saying the investor thought "we could raise $$ in 1.3 secs easy," adding, "i have a feeling the valuation won't differ that much across VCs but if we can pick who we work with that'd be nice."

b.  After the first time Grasso expressed anxiety about Allen's time commitment, Allen asked Grasso where she should focus her time as between the marketing site and helping Grasso with the user interface. Grasso suggested the user interface was more important, again using the pronoun "we". He specifically asked Allen if she can do some mock-ups of themes and said, "getting another designers (ie you) perspective on the "edges" of where we might want to go with the theming would be helpful." He added, "and, fyi, if we want to seamlessly migrate your mockups into actual themes... - you should consider using fonts available on..."

c.  On July 8, 2017, Grasso asked Allen, "id like us to get a list together of what we collectively feel is missing from the current build in order to feel good about showing it off. showstopper/annoying bugs, UX quirks, missing template options, etc." Allen agreed and they meet for that purpose. They started using a Trello board, to track all the bug fixes isolated by Allen and communicate them to Grasso. Some fifty-two Trello cards were created by Allen finding bugs and suggesting fixes.[4]

d.  On July 14, 2016, Allen wrote to Grasso about the product, "can you tell me more about where we're going with the new UI... are we moving away from the 'variations' pattern that can be applied from the slide?" Grasso didn't correct Allen and say for example, "You mean where *I* am going..." Grasso answered with his thoughts.

---

[4] Many of these fixes involved copyrightable text authored by Allen and then directly integrated into the application by Grasso.

e.  Towards the end of July 2016, in response to one of Allen's marketing ideas for the demo, Grasso acknowledges the value in Allen's proposal and confirms, saying "we show both the good design and the easy interactivity in one, I like it." Grasso was suggesting to Allen that they would be showing the product together, in the future.

f.  On August 4, 2016, Allen proposed quitting her job at Projector to work full-time on Beautiful Slides. Allen is informed and believes that Grasso. independently wealthy, was nervous about Allen, not independently wealthy, quitting her job since there was no way to pay the partners at that time. Grasso responded to the effect, not yet, "hopefully we can get there soon." Allen and Grasso went on to talk about more user testing feedback.

Grasso's use of the "we" in the present and future tense, coupled with the fact that she was not receiving compensation otherwise, further cemented Allen's expectations as alleged herein that the two were working together and would share profits from that work if any, as did what followed.

On August 11, 2016, Allen proposed introducing Grasso to one of her investor contacts and asked Grasso if it was okay to refer to them as working together on Beautiful Slides. Grasso agreed that it was fine. Allen then sent a draft letter for Grasso's approval, which said:

I hope you're well. I wanted to update you on a side project I am working on with an old coworker from Sliderocket. We're in the early stages of raising capital and we would love the opportunity to show a16z what we've built. I know you have been a fan of SlideRocket in the past, and what we're building now is another presentation tool.

We think there's a lot of room to grow in the enterprise productivity space, and we're focused on building a great user experience to start. We have a product in private beta and there is a lot of interest from the people we've shown it to.

21

1       We would love to schedule a meeting to see if there's a fit to work with your firm.

2       If you're up for it, I would introduce Mitch Grasso, who would be taking the

3       meeting as I am currently working at another company.

4

5       Upon receiving this text, Grasso did not object to the characterization of the two of them

6   working together, nor suggest that was misleading. To the contrary, in proposing a more direct

7   approach, Grasso maintained that aspect of it, proposing:

8

9       I'd like to introduce you to Mitch Grasso, who was the founder of SlideRocket

10      and sold to VMware a few years ago. Mitch and I are working on a new startup in

11      the presentation space and I thought it might be interesting to connect you to

12      discuss.

13      In August and going into early September 2016, Grasso and Allen discussed investment

14  from several investors. After Grasso had hard commitments for money, Grasso still used "we" in

15  referring to the who owned the business. In continuing the discussion about possible names in

16  early September 2016, for example, Grasso said "if we go down that path, there are better names,

17  I'd think." This discussion is followed by Allen proposing the tagline "work smart, simply and

18  beautiful," a form of which is still being used today.

19      It was not until mid-September 2016, after hard money commitments came in, that

20  Grasso changed his tune. On about September 12, 2016, Grasso and Allen discussed Allen's

21  potential compensation if she left Projector and started working on Beautiful Slides full-time.

22  After talking about salary, Allen said, "I think the equity is a trickier discussion and as you know

23  I want to be involved in a meaningful way."

24      Grasso immediately began a campaign to diminish Allen's contributions, in hopes of

25  bullying her into taking a *de minimus* share.

26  **INTERROGATORY NO. 12:**

27      Identify, by date, number of hours spent, and nature of the work performed, the amount

28  of time You spent performing work relating to the Software in Any manner, including but not

22

1  limited to development and marketing.

2  **RESPONSE TO INTERROGATORY NO. 12:**

3      Allen incorporates by reference her Preliminary Statement and General Objections set

4  forth above. Subject to and without waiving her objections, Allen responds as follows:

5      Allen did not keep time records and cannot identify "by date, number of hours spent."

6  Allen has described the nature of the work performed and approximate date ranges in her

7  Response to Interrogatory No. 11, above. Allen estimates that she has spent 760-840 hours

8  performing work relating to the Software in Any manner, including but not limited to

9  development and marketing.

10  **INTERROGATORY NO. 13:**

11      Identify the date when You contend that Grasso formed the "intention[] to cut [You] out

12  of any meaningful profit from the development of the new software known as Beautiful Slides,"

13  as stated in Paragraph 53 of the Counterclaim.

14  **RESPONSE TO INTERROGATORY NO. 13:**

15      Allen incorporates by reference her Preliminary Statement and General Objections set

16  forth above. Allen additionally objects as the Counterclaim is no longer the operative pleading in

17  this action. Subject to and without waiving her objections, Allen responds as follows:

18      Allen does not know when Grasso first formed the "intention[] to cut [You] out of any

19  meaningful profit from the development of the new software known as Beautiful Slides," Grasso

20  may have always intended to keep the value of Beautiful Slides for himself. But, when Grasso's

21  conversations with potential investors went very well in approximately August 2016, Allen

22  alleges on information and belief that, if Grasso did not always intend to keep the value of

23  Beautiful Slides for himself, Grasso changed his mind at that point.

24  **INTERROGATORY NO. 14:**

25      Identify the property and/or property interests that You claim, in Your Second Cause of

26  Action, were converted by Grasso and/or the Company.

27  **RESPONSE TO INTERROGATORY NO. 14:**

28      Allen incorporates by reference her Preliminary Statement and General Objections set

23

1   forth above. Subject to and without waiving her objections, Allen responds as follows:

2       Allen contends, at this early state, that Grasso converted all non-copyrightable property

3   and/or property interests arising out of the partnership, including but not limited to equity

4   in/stock certificates of a corporation with millions in cash, the right and interest in management

5   and control of the corporation, the right and interest in compensation from the corporation.

6   INTERROGATORY NO. 15:

7       Identify the terms of the implied contract that You claim, in Your Third Cause of Action,

8   existed between You and Grasso.

9   **RESPONSE TO INTERROGATORY NO. 15:**

10      Allen incorporates by reference her Preliminary Statement and General Objections set

11  forth above. Subject to and without waiving her objections, Allen responds as follows:

12      The general terms of Grasso and Allen's implied contract include the following: to jointly

13  develop a business and a software product, and to share any benefits derived therefrom equally.

14  **INTERROGATORY NO. 16:**

15      Identify the facts upon which You base Your contention, in Paragraph 25 of the

16  Counterclaim, that, "[o]n or about October 3, 2016, Grasso responded by deleting files in an

17  effort to wipe out evidence of Allen's contributions to the business and venture."

18  **RESPONSE TO INTERROGATORY NO. 16:**

19      Allen incorporates by reference her Preliminary Statement and General Objections set

20  forth above. Allen additionally objects as the Counterclaim is no longer the operative pleading in

21  this action. Subject to and without waiving her objections, Allen responds as follows:

22      A screenshot from Dropbox, the PDF of which is entitled "Screen Shot 2016-10-05 at

23  9.50.35 PM", showing Grasso's deletion of videos and work file, produced in response to the

24  accompanying document production requests. In addition, Allen discovered deletion of a

25  evernote notebook.

26  **INTERROGATORY NO. 17:**

27      Identify, by date and individual or entity, the individuals and/or entities for which You

28  have performed services in exchange for monetary compensation between January 1, 2013 and

1  the present.

2  **RESPONSE TO INTERROGATORY NO. 17:**

3      Allen incorporates by reference her Preliminary Statement and General Objections set

4  forth above. Subject to and without waiving her objections, Allen responds as follows:

5      Evernote, May 2016—Present

6      Projector (Orphid), May 2015—December 2016

7      Product School, December 2015—June 2016

8      RealQuorum, December 2014—May 2015

9      Krystallize, December 2014—March 2015

10     Stand, March 2014—May 2014

11     VMware, April 2011—January 2014

12  **INTERROGATORY NO. 18:**

13     Identify the nature of the services You performed for the individuals and/or entities You

14  identified in response to Interrogatory No. 17.

15  **RESPONSE TO INTERROGATORY NO. 18:**

16     Allen incorporates by reference her Preliminary Statement and General Objections set

17  forth above. Subject to and without waiving her objections, Allen responds as follows:

18     Evernote, Product Manager, Increased user retention 5% with new features designed to

19  improve engagement and increase paid conversion.

20     Projector (Orphid), Product Manager, Set up repeatable processes for developing first

21  customers, releasing product, and validating product/market fit for three product lines in a seed

22  stage startup—working with a team of seven developers. In addition to product management,

23  designed and coded customer-facing features and marketing assets, and set up systems for

24  measuring engagement.

25     Product School, Taught classes for people who want to be product managers.

26     RealQuorum, Provided product design and website design/engineering services.

27     Krystallize, Provided specification, product roadmap, graphic design and graphic design

28  support.

Stand, Provided product design and website design/engineering services.

VMware, Senior Product Manager Mobile & Platform, Released growth products increasing registrations and active use—including a new SaaS freemium offering and a platform for developers to easily develop on the Socialcast API; Release all-new mobile apps, the first enterprise text messaging app, and MDM support in order to renew contracts with Fortune 100 customers representing 80% of Socialcast revenue; Optimized user experience and high value activities associated with paid conversion.

Dated: October 13, 2017

WOOD ROBBINS, LLP

By: _____
    Kristen E. Drake
    Attorneys for Defendant and
    Counterclaimant MAY ALLEN

DEF'S OBJ. AND RESPS. TO PLS' INTERROGS. SET ONE,
CASE NO.: 3:17-cv-01091-MMC

# VERIFICATION

1

2   I, MAY ALLEN, am the Defendant in the above-entitled action to whom these First Set

3   of Interrogatories are addressed, propounded by Plaintiffs and Counter-Defendants BEAUTIFUL

4   SLIDES, INC. and MITCH GRASSO.  I have read the foregoing responses thereto, know the

5   contents thereof, and believe the same to be true.

6   I declare under the penalty of perjury under the laws of the United States that the

7   foregoing is true and correct.

8   Executed this $\overset{13}{\underline{\phantom{xx}}}$ day of October 2017, at Redwood City, California.

9

10  _May Allen_
    _____

11  MAY ALLEN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

1

## CERTIFICATE OF SERVICE

2    I, Kristen E. Drake, hereby certify and declare as follows:

3    I am over the age of 18 years and not a party to this action. My business address is One

4   Post Street, Suite 800, San Francisco, California 94014. On the 13 October 2017, I caused to be

5   served a copy of the foregoing:

6   DEFENDANT AND COUNTERCLAIMANT MAY ALLEN'S OBJECTIONS AND

7   RESONSES TO PLAINTIFFS AND COUNTERCLAIM-DEFENDANTS' FIRST SET OF

8   INTERROGATORIES

9   By the method indicated below. and addressed to the following party(ies):

10   William J. Frimel, Esq.
     SEUBERT FRENCH FRIMEL & WARNER LLP
11   1075 Curtis Street, 2nd Floor
     Menlo Park, CA 94025
12   Tel: 650.322.3048
     Fax: 650.833.2976
13

14   _____ Placing the same in the United States Mail, postage prepaid

15   _____ Sent by fax

16   _____ Hand-delivered

17   __X__ Sent by overnight mail, fees paid (e.g., FedEx or UPS)

18

19    I declare under penalty of perjury that the foregoing is true and correct. Executed on the

20   13 October 2017.

21                                        Kristen Drake

22                                        Kristen E. Drake

23

24

25

26

27

28